Our next case is Cheryl Metz v. OPM, 2023-1873. Mr. Chusey, are you ready? Your Honor, if the Court pleases Mr. Pershing, I will be arguing. Oh, all right. Oh, I'm sorry. Sorry. Yes. Mr. Pershing. Mr. Chusey is at my side. All right. Thank you. Please proceed. Good morning. May it please the Court. Steve Pershing for Petitioner Cheryl Metz. I'd like to reserve three minutes for rebuttal. I want to talk about three things today. First, a brief word about the legal standards. Second, a look at the agency's evidence against ours. And third, a bit about the proper use of the adverse inference that the administrative judge properly imposed against the government for obdurate refusal to produce a discovery and then should have implemented in our favor in the decision, but did not. But she signed the waiver. She signed the waiver. Sir, Your Honor, Judge Lurie, the issue is whether she signed the waiver. Of course, we don't conceive that. We have the document. All right. The Fraud Branch found that the signature was genuine. Glad you mentioned. The Fraud Branch gave us a one pager. The one pager said Fraud Branch decided that this was a match with some things they had on file. They produced nothing in response to our interrogatories and document requests, nothing to support it. All we have is that one page with that one sentence. And what happens, the A.J. says, that is not proper discovery conduct. It was obdurate. It was improper. But the A.J. listened to all the testimony and the experts on writing and looking at various samples. What standard of review do we apply to the detailed analysis by the A.J.? The A.J.'s proceeding below, assigned to Cheryl Metz, the burden to prove the signature on the waiver form more likely forged than real. This court sits now to review whether on all the evidence, theirs, ours, and what we did with theirs, the record as a whole, that's voucher. The court must now review whether all of that, on all of the record, the judge's rejection of all of our proofs was supported by substantial evidence. Of course, we say it was not, not at all. Basically, what the judge did was conform, the A.J. did was basically just conform the doubts he had about testimony of our witnesses on undisputed issues, not just the expert evidence, but the lay evidence of Cheryl's condition and so on, conformed to his theory going in that, well, she signed, therefore, everything else she's saying must be a made-up story. So our problem is, the challenge facing the court is to review, to perform its review function on this, not simply to accept speculation and conjecture that ignore or replace actual evidence, particularly undisputed evidence. That's, that's, that's Cheeseman, that's Foucher, that's Habe, that's Pope, that's Tudor about the testimony not in conflict, and that's, and of course, the E.U. and the Notarization can be rebutted. The only things, the only bits of evidence that the agency produced itself were the presence of a signature and the presence of a notarization. Both of those have been fatally undermined. May I explain? First of all, the, first of all, the, the, the, the, the handwriting expert that we called was one of the nation's best known and most, most respected. She'd been testifying for decades for the government, for the Secret Service, INS, DHS, she was a government employee. She did this for a living for decades. And she looked at objective criteria, look at 59 and 60 and 61 of the appendix, and the court will see exactly what she looked at. There are nice arrows pointing to things. The judge noticed, the administrative judge noticed what she was saying. He said, well, that's not true because I know she signed. No, I don't, I don't, I discount all that. How did she discount, how did the administrative judge discount to zero Don Eisenberg's handwriting expertise and her evidence? He said, well, she, she didn't know that Cheryl was sick. In fact, she didn't know that Cheryl was so sick that it might have affected her competence. And the testimony shows that Ms. Eisenberg's telling the court that if a signer was that impaired, there would be a tremor. There would be evidence in the writing habit. And there was none. So either you say, well, that's because Cheryl didn't sign it, or you say, well, that's because she signed it, but she wasn't sick. But then when you look at what the judge did to discount to zero the testimony of the medical expert, he said, well, the medical expert didn't actually see her take the medication. The far-fetched speculation and conjecture you have to resort to, to suppose that someone in agony after one of the most painful kinds of surgery you can have in modern medicine wasn't taking the powerful narcotics she'd been prescribed that had been refilled over and over. It's just, it just strains credulity. So, but there were two opposite ways that the AHA chose to discount to zero the testimony of both of these experts. And they were opposite reasons, like Your Honor was saying in the previous case. When they're opposite reasons like that, you have a real problem. The judge says, well, I discount to zero the testimony of the handwriting expert because she didn't know that Cheryl was that sick. And then I discount the medical expert's evidence because he didn't actually see her take the pills, and so she must not have been that sick. Those two things don't go together very well, I'm sorry to say. I have sort of a list of the speculative and conjectural mental steps that I believe the decision below went through that just shows you how remote the speculation and conjecture really are. She rejected Donna Eisenberg for the reasons I just mentioned. She rejected Dr. M, Americangus was his name, the medical expert, for the reasons I just gave, which were opposite to the reason he employed for the handwriting expert. He rejected Cheryl's evidence because, well, she didn't answer directly. The decision below didn't identify a single less than direct response. The OPM briefs do not. The government's briefs do not, even before this court, identify a single one like that. She was inconsistent. Really, I submit to the court that the only inconsistency we see is with the agency's theory that she had signed a waiver. Every one of her answers was consistent with her sworn contention that Richard had forged the signature. OPM failed to show a single answer to all of these aspects of fact finder drawing credibility conclusions. The credibility. Well, this is what an appeals court is not likely to reverse. Credibility, deference, credibility, deference is taken out of the equation on when sufficiently, as the court in Habeas says, you overturn the credibility finding. The court may do so if there are sufficiently sound reasons in here. There are. You can't identify inconsistencies unless you place them against the judge's speculation and conjecture. You have a handwriting expert expertly refuting that this was her signature. You have a notary who couldn't have been there by referring to just the evidence of the witnesses. Just to be clear, the expert said, I think, so tell me if I'm wrong, she had a strong opinion that Ms. Metz probably did not sign it. Yeah. That was an unassailable, this is not her signature. I just want to be clear that I'm reading the record correctly. I think you are, Your Honor, but let's just make sure we understand the nature of the testimony. Ms. Eisenberg said that a whole slew of signatures were forged and that they were the product of the same forger's handwriting. Then she said, I believe it is strongly likely that this one, which is our Q1, I think it's OPM 11, the actual March 88 waiver form, Appendix 90, that in all likelihood, she said, that was forged also. She pointed out the aspects, the objectively visible aspects of the waiver form signature that matched the forger's and not Cheryl's. The judge would have to reject all of that and the only way he did it was, well, she didn't know that Cheryl was so sick that her competency would have been called into question. The expert duly responded, as I said, and said to the court, if there was that kind of illness or impairment, there would have been a tremor. There was none. Either Cheryl didn't sign it or she signed it and didn't take the meds and that she was perfectly confident and that's why there was no tremor. That's the remoteness of the conjecture we'd have to deal with, not to accept the handwriting expert's understanding of all this. Now, and again, the medical expert's testimony is discounted to zero. It's because, well, he didn't actually see her take the medications. Do we know any doctors who actually do that anymore today? Even nurses don't do that anymore today. All we know is Dennis saw her take medication and she kept getting refills for them and she also knew that if she didn't take at least one of the medications, she would have seizures. It was also testimony that she didn't take the medications. She'd have withdrawal symptoms, post-ictal issues. Those are undisputed in the record. OPM didn't produce any handwriting expert. Let's just focus on that for a moment. This is about the adverse inference. OPM did not produce a jot of evidence of its basis for this fraud grant one-pager. None. We asked over and over, tell us who judged the match, on what basis, what documents did you review that you say you compared against, all of that. They didn't say anything. You know what they said? They said, well, she has the burden. We don't have to produce anything. Your Honor, I'm sure the court will recognize that that is the opposite of justice. That's through the looking glass. If you have a burden, that's why we have discovery, so you can meet the burden. Did anybody call the notary? The notary died in 2009, long before he could be cross-examined. That's an important point, Your Honor, because in 2006, when Cheryl discovered this March 88 letter, and discovered that it wasn't hers, she, I'm sorry, when later, when Richard died and she applied for the survivor, I know that she believed she had agreed with him that he would provide to her, OPM didn't do anything. And if they had, she would have had a chance to have a proceeding, and they would have cross-examined this notary who died in 2009. Richard died in 2006, November. By the way, did you notice that the A.J.'s opinion said it was undisputed that Richard kept Cheryl on his health insurance until he died. That is precisely not the case. That's note 14 in the A.J.'s opinion. It, in fact, is not true. Richard took Cheryl off his self and family health insurance in open season of 05. OPM called her one day on the phone in early 06, about February, and said, hello, Ms. Metz, what plan do you want now that you're on your own for health insurance? She had no idea what they were talking about. This is all undisputed testimony in the record. I can cite the pages. And she says, let me go back and look. She goes to the file, she finds it. Sorry, Your Honor. You're three minutes, you're into your rebuttal time. Well, I will reserve my time for rebuttal. You can serve it. Thank you, Your Honor. Ms. Jettis. Good morning, Your Honors, and may it please the Court. This is precisely the sort of fact-intensive case relying on witness testimonies and credibility determinations and factual evidence that this Court should be hesitant to disturb. The A.J. was in the best position to make credibility findings, to weigh the evidence. And in this case, he relied on the strongest evidence in the record. Let me ask you a couple of questions here. First, I think you have a strong argument on the forgery point, okay? But I'm troubled by the A.J.'s decision on the competency point. And I'm troubled for two reasons in particular. One, the claimant specifically testified that she took her medication. There's no recognition of that in the decision of the A.J. And the A.J. found the expert on competency, Dr. Mingus or whatever his name is, to handle himself in a professional manner. And she doesn't find him incredible. She just says that there's this missing link about taking the medication. Well, he testified that patients usually take medication. And she explicitly testified that she did. And there's no recognition of that. That's my first problem. My second problem is she seems to describe the expert's testimony because it conflicts with Mrs. Eisenberg's testimony. Where's that? What's the A.J. talking about? This is on page 8, A8. She says, Dr. Mingus contradicted Mrs. Eisenberg's opinion as well. What? Where? I believe... It's not an accurate statement. Well, the conflict between the two theories that the administrative judge found troubling was... Well, not theories, testimony. Where's the testimony? She says, as explained later, Dr. Mingus contradicted Mrs. Eisenberg's opinion as well. Where did he do that? I'm not sure exactly which line, but the conflict... If it's not there, it's not there. And the A.J.'s wrong. Well, I'm not sure if the A.J. was referring to a specific line of testimony so much as the fact that one expert is testifying... No, she's... The A.J. says, as explained later, Dr. Mingus contradicted Mrs. Eisenberg's opinion as well. Where is that contradiction which the A.J. relied on? Because Dr. Mary Congess was testifying that she couldn't have... It was testifying that she was in a state where she was heavily drugged and would have been unable to sign a document that contradicted that... No, no, no, no, no, no. That's not what he testified to. He didn't testify that she would be unable to sign a document. He said she wouldn't know what she was doing. Yes, but it can be inferred from the testimony that the condition she was in would have significantly affected her signature, which is why the A.J. was troubled by the fact that the handwriting expert had no awareness of the condition that Mrs. Eisenberg... What can we do about the handwriting? What is it that undermines Dr. Mingus's testimony? She finds that his testimony is undermined by a contradiction with the handwriting expert. What contradiction? I'm not sure what contradiction that would be referring to, but the theory... That's the problem, don't you think? At most, that's... If the A.J. says something which is inaccurate, that's a problem with the opinion, isn't it? Perhaps, but it's a small problem. In this case, there's more than substantial evidence to support the A.J.'s decision. Chairman Pickens... What's the substantial evidence to support the position that she was competent? Well, the substantial evidence starts with the fact that there's a signed, notarized document. And this isn't about just a preponderance of the evidence... You can't sign a notarized document if you're incompetent. It happens all the time. No, but we have to start with the strong presumption that the document is valid, and... Strong presumption that she's competent? Where does that come from? No, no, a strong presumption that a notarized document is valid. I understand that, and that seems correct. We're not talking about a forgery issue. We're talking about whether she was competent to understand what she was signing. Yes, I'm simply framing the issue by saying the evidence of incompetence must be strong enough to outweigh a strong presumption of validity. And in this case, it's not because it's circumstantial evidence. They testified to her general condition over those years. No, he just said if she was taking this medication that she was prescribed, she would not have been competent. That is the sole testimony on that point. He said that explicitly. And the judge seemed to have some doubts as to whether there was evidence that she took the medication, but she did explicitly testify that she took the medication, right? Yes, she did, but the judge also pointed out issues... He didn't find that testimony incredible, right? Well, he found her general demeanor to undermine her credibility, and he noted that. And as I think we're all in agree, those credibility determinations are virtually unreviewable on appeal. But where did he find that she was generally incredible? I didn't see that. I found him saying that she was incredible in the testimony about the forgery, but where did he find that she was generally incredible? I don't think he dismissed the entirety of her testimony as generally incredible. Okay, well, that's the problem. But he made also... She testified explicitly that she took the medication, and he didn't deal with that testimony. But she also testified, and she and Dr. Mary Congress testified, that she would not have been able to remember things very clearly during that period. Okay, that's another part of her testimony. So remembering that she took her specific medication on a specific date, it's simply too circumstantial to overcome a strong presumption of a notarized document. All the presumption you get from the notarized document is that she signed the notarized document in the presence of the notary, and one can accept that. That's probably a good finding. But that doesn't mean she was competent to sign it at that time, right? Perhaps not, but the notary presumably believed that she was competent to sign. Really? Notaries make that determination? What's the evidence of that? I'm not sure if there's any evidence in the record for that, but the government is entitled to rely on a notarized document, so that we don't get 20 years later into these debates about what happened on a specific date that Ms. Metz acknowledges she can't remember. Is there any case that you're aware of that says that signing a document from a notary indicates that you're competent to sign it, to understand it? No, Your Honor. No, I didn't think so. Simply that there's a strong presumption in favor of a notarized document, and in this case the contrary evidence is circumstantial. It's evidence of her general state of mind during that time period. It's a review of the medications she was taking. So you believe that A.J. does not disbelieve the expert's testimony that if she were taking the medication she was incompetent, correct? I believe that's correct, Your Honor. But nobody knows what medication she took that specific day. We know what she was generally prescribed during that time period. We know the general state that she described and that her son described. But to overcome the presumption that the government can rely on a signed and notarized document based on circumstantial evidence from the general time period, that A.J. reasonably found that that was insufficient. And the only question here is whether that was supported by substantial evidence. It's not whether reasonable minds might have reached a different conclusion. And the judges also pointed out inconsistencies between the two theories. Ms. Metz is quite adamant that she did. What's the inconsistency between the two theories? Well, she's very adamant that she did not sign the document, but on the other hand. If she were incompetent, maybe she didn't remember. But precisely. So how can she be so adamant that she did not sign it if she's also admitting that in her mental state she might not have been aware of signing it? She didn't. There's no finding to that effect, right? I'm sorry, to what effect? There's no finding to that effect. He didn't find that because she was incredible on the forgery, she was incredible about taking the medication. Well, he found that the theories were inconsistent because, on the one hand, she's saying that she couldn't clearly remember things. On the other hand, she's denying that she signed the document. And on the one hand, she's saying that she was seriously impaired, but on the other hand, not informing the handwriting expert of her state at the time, even though the handwriting expert acknowledged that drugs and medical conditions can significantly affect a person's signature. The A.J. found these inconsistencies to be among the evidence against the idea that she was incompetent, but his primary finding was that we have a signed and notarized document, the signatures, and to your Honor's point, that the notary. You're right. I mean, there's plenty of evidence that it wasn't a forgery. But the handwriting expert. That's not what my questions are directed to. My questions are directed to the question of competency. And the finding that his testimony was inconsistent with the other experts' testimony, there's no support for that, and he simply didn't address the question of whether her testimony that she took the medication should be credited or not credited. There is support because, as you just heard, the handwriting expert clearly testified that if she was on all these medications and in the state there would have been tremors in the signature, she basically made the clear finding that the signature she was looking at was not by a person that was under these medical conditions. So as your Honor said, the notary maybe was not paying attention to her level of competence, but you're agreeing that the notary witnessed her sign the document. But her own handwriting expert said this was not a signature by someone on all these drugs and medications. So if she signed the document, her own handwriting expert is saying that she was not in the state that she claims to have been in. So that's the contradiction that the A.J. is pointing to. And, again, all of this, it's Ms. Metz's burden to show. So, yes, he found contradicting evidence, and he found that circumstantial evidence. Where does the handwriting expert say that the signature indicates she wasn't on medication? Yes. It's in Plaintiff's Brief they discuss. If you look at page 42 of Plaintiff's Brief, and that's citing to Appendix 364, among other things she says, when you're dealing with someone who is medically impaired, the telltale signs are not what was seen in the question signatures. What you see is poor line quality. You see tremor. The differences are not consistent with what I found in the forged signatures and submitted as evidence in this case. She looked at the signature in question and did not find that it was affected by medical impairment. That directly contradicts the testimony that she was not in a state of mind. The only way that Ms. Metz can get around that is by arguing that the signature was forged, but that would have to overcome the strong presumption that a notarized signature can be relied upon. And it would be, you know, it would, there's all the other evidence in the record that we haven't been discussing because we've been focusing on competence. There's the AJA's analysis of the signatures in the record. So at the end of the day... The testimony on 364 is that it wouldn't be written by someone who's physically impaired. It doesn't talk about mental impairment. Right, but she's testifying that she was in a body brace, that she was lying on her back, that she was recovering from spine surgery. Okay, but this doesn't contradict the notion that she was incompetent, mentally incompetent, right? Perhaps not, but it contradicts that she was in the state described by Dr. Marie Kongos where these drugs were significantly impairing both her physical and her mental abilities. The doctor also testified he had no idea whether she was taking or not taking the medication at the time she allegedly signed the document, right? Precisely, which further undermines the argument that... Not quite. He said that people usually take the medications that are prescribed for them. Right, and these address two different theories. He said that they generally do take the medications, but if that's true, why did the handwriting expert find that there were no signs... Mental impairment? She never said that. No, she didn't say mental impairment because that's not what she was testifying about. But if you look at Dr. Marie Kongos' testimony, the fact that she was on these heavy drugs that affect her physically and mentally, and then if you look at the handwriting expert's testimony, that there was no evidence of physical impairment or any of the issues caused by medication, the evidence contradicts each other. And yes, it's possible that she wasn't on the medication, but that would mean that she had been competent. It's possible that she was taking the medication, in which case the handwriting expert is suggesting that this couldn't have been her signature. But then at the same time, the administrative judge compared the signatures himself, looked at them very closely and carefully, and provided a thorough opinion as to why he believed that the signatures were a match, why he didn't think that a handwriting expert, who was not aware of her condition at the time of signature... That's all. I'm not questioning the finding that there was no forgery. I'm questioning the finding that there was no lack of competency because he didn't address certain testimony and because he found a conflict as to mental impairment, which doesn't exist. I understood, Your Honor. There is a conflict between Dr. Mary Kongos' testimony and the fact that the handwriting expert found that there were no signs that she was on medication that would significantly infect her physically and mentally. She didn't testify mentally. No, but she didn't testify mentally, but she testified that it didn't look as though she was on medication. She didn't say that either. She said this is not the kind of signature of someone who's physically impaired. Yes, but when you compare that to Dr. Mary Kongos' testimony about the nature of the effects that the drug was having on her... Where does she testify that she was physically impaired? He testifies... I'm not sure if he specifically uses the language physically impaired, but he talks about how heavily they affect her overall, that she can't think clearly, she can't remember, she can't do any form of work. That is simply inconsistent with the idea that there would be no sign of any sort of physical change to her signature. And beyond all that, the administrative judge found that this was circumstantial evidence. She was prescribed these medications, but nobody knows what happened on that date. Unfortunately, that makes it difficult to reach a clear conclusion either way, but it's Ms. Metz's burden. We have a strong presumption in favor of an authorized document, and while there is conflicting evidence in the record, the administrative judge was in the best position to make credibility determinations. He commented on the demeanor of each witness and the reason that those gave him doubts. He never said anything about the demeanor of Dr. Moringa's testimony. She said the exact opposite. Yes, I'm not talking about Dr. Moringa specifically. I'm saying that overall, the administrative judge considered the witness's demeanor, he considered conflicting evidence in the record, and he reached the conclusion, which perhaps Your Honor might have reached a different conclusion, but his conclusion was fully supported by the record that it was insufficient to meet her burden and to overcome the strong presumption in favor of a notarized document. Thank you, counsel. Do you have any argument? Mr. Pershing has some rebuttal time. Thank you, Your Honor. The presumption of validity of a signature is a rebuttable presumption. It's not a conclusive one, as the agency effectively maintains. Let's look at why the presumption can be rebutted in the court's understanding today. First of all, the notary can't have been there because it's clear she was bedridden and there's no evidence that the notary ever visited her, that she could have gotten up and gone to a bar. Remember, he is the local bar owner. The idea that that day, the day, that April 9th, she could suddenly, miraculously improve her condition enough to judge what might be putting it in front of her, that's strange credulity if somebody is in agony like this. Remember, the surgery was so unsuccessful that it had to be redone in June, that entire six-month period. She's in terrible pain in the body brace and so on. Didn't sign? Well, her eye tells her it's not her signature, and the rebuttal comes in the form of a handwriting expert's testimony, even if the court doesn't accept it. That means that there is rebuttal evidence in the record. Don't forget that there's evidence that Richard was a serial forger. Even Dennis found that Richard had forged Dennis' signature not once but twice. Once on that Social Security scheme to get more money when he was a minor, and the other is cutting the fiancé off and replacing himself as beneficiary on Dennis' life insurance policy, and he confronted the dad. The dad admitted it and said, well, the fiancé didn't deserve that money. The serial forger evidence is significant. The AHA recognized that evidence and said, well, I just don't believe any of these people. I don't believe the expert because the handwriting expert didn't know she was sick. And the medical expert didn't know for sure that she was actually taking the medications and therefore was impaired. This is a classic example of fitting the facts to the theory, and it's a theory that's based in rank speculation, and that's our problem. You can't replace evidence with conjecture and speculation. The case law says you can't do that. So what other questions might the court have? That's all I have. Thank you, counsel. Thank you.